**Bob INGRAM, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A–11987.**

Criminal Court of Appeals of Oklahoma.

Oct. 6, 1954.

Hal D. Leaming, Leon Shipp, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., James P. Garrett, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

Bob Ingram, plaintiff in error, hereinafter referred to as defendant, was charged in the court of common pleas of Oklahoma County with the offense of making a false statement on registration in violation of Tit. 21 O.S.1951 § 200; was tried before a jury, found guilty and the jury being unable to agree upon the punishment, the same was fixed by the court at confinement in the Oklahoma County jail for a period of ninety days, and to pay a fine of $300. Appeal has been duly perfected to this court.

The pertinent portion of the amended information reads as follows:

"On the 17th day of March, A.D. 1953, in Oklahoma County, State of Oklahoma, 'Bob' Ingram, whose more full and correct name is to your informant unknown, then and there being, did then and there wilfully, unlawfully and wrongfully commit the crime of Making False Statement upon registration in the manner and form as follows, to-wit:

"That is to say, the said defendant, in the county and state aforesaid, and on the day and year aforesaid, then and

there being, did then and there wilfully, unlawfully and wrongfully make a false statement and representation to procure his name to be entered upon the precinct registration book of Precinct 5 of Ward 3, Oklahoma City, said county and state, the same being a registry of voters authorized by law to be kept in said election district, which said false statement and representation was as follows, to-wit: that he, the said defendant, was and had been a continuous resident within Precinct 5 of Ward 3, Oklahoma City, said county and state, for thirty days next preceding the Municipal Primary Election held on March 17, 1953, when in truth and in fact the said defendant was not a resident of said district as represented, all of which he, the said defendant, well knew, and the said defendant knowingly made the false statement and representation with the unlawful, wilful, wrongful and fraudulent intent to procure his illegal registration as a qualified voter of said election district, contrary to Section 200 Title 21 of Oklahoma Statutes 1951, and contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma."

Tit. 21 O.S.1951 § 200, reads:

"Every person who, at the time of requesting his name to be registered as that of a qualified voter, upon any registry of voters authorized by law to be kept in any city, town, or election district, or at the time of offering his vote at any election, knowingly makes any false statement or employs any false representation or false pretense or token, to procure his name to be registered, or his vote to be received, is guilty of a misdemeanor."

The charge was based upon a registration affidavit executed by the defendant on the 17th day of March, 1953 purportedly before Mrs. W. F. Gorman, registrar for Precinct 5 of Ward 3, the pertinent portion of which registration affidavit reads as follows:

Registration Affidavit

"Ingram, Bob.

"I do solemnly swear that I am a citizen of the United States of America and will have continuously resided in said State one year, in said County six months, and in this precinct thirty days next preceding the next election. Residence: O.K. N. Walker Street No. 2 Post Office: O.K. Occupation: City Bldg. Supt. Age 53 Race: C, Color: W, Politics: Dem.; Color of hair, Grey; Color of eyes: Grey. Height 5 11½. Weight 175; that he—she refers to E. J. York and Mrs. Thompson, qualified electors of and freeholders in said precinct as witnesses to the facts hereinabove set out."

Based on the above affidavit, there was issued to Bob Ingram the following Registration Certificate:

"Registration Certificate   No. 845
"Precinct No. —      Ward Three
Edmond County of Oklahoma, State of Oklahoma.

"Bob Ingram has this day applied for registration as an elector in this precinct and on oath says that he—she is a qualified elector in School District ——— County of Oklahoma, State of Oklahoma; that his—her name is Bob Ingram; Residence O.K., Street No. 2 N. Walker; Post Office O.K. Occupation, City employee. Age 53; Race C; Color W, Politics Dem.; Color of hair, Grey; Height 5–11½, Weight 175, Color of eyes, Grey; that he—she refers to E. J. York and Mrs. Thompson qualified electors of and freeholders in said precinct as witnesses to the facts herein above set out. The elector was last registered in Precinct 15, Ward—Twp. One in Okla. County, Oklahoma. Dated this 17 day of March, 1953. (Signed) Mrs. W. F. Gorman, Registrar. State Exam. & Insp. No. 1262."

Endorsed on back: "Voted 3–17–53
                                   407–53"

The evidence of both the State and the defendant showed that the defendant actually gave as his residence "200 North Walk-

er" rather than "2 N. Walker" as recited on the certificate and affidavit.

This case presents an unusual situation in that there is no conflict in the evidence of the State and that of the defendant. The problem is in the application of the law. For reversal four specifications of error are interposed, setting out that the court erred: (1) in not sustaining defendant's demurrer to the evidence and motion to dismiss; (2) in not directing a verdict of not guilty at the conclusion of the evidence; (3) in overruling defendant's offer of evidence as to the common accepted practice of voting registration in the State of Oklahoma; and (4) in overruling the defendant's objection to evidence offered by plaintiff to which defendant duly excepted.

The propositions presented are so interrelated that we shall treat them together after a summary of the pertinent evidence presented.

Dwain Box, secretary of the Oklahoma County Election Board, testified for the State, stating that on March 17, 1953 there was held in Oklahoma City the Oklahoma City primary election and that the polling place for Precinct 5 of Ward 3 was at the Albany Hotel, 121 South Harvey, and that the precinct registrar was Mrs. [W. F.] Gorman, and that the judge of the precinct was Ellmore Pinnick. Witness further testified as follows:

"Q. Will you state to the Court and jury the procedure under the law by which a person is registered within an election district? A. Well, a person makes an application for registration in his precinct at his precinct registration place. Normally they are made at the Registrar's home or at the polling place, and in making said application we have in Oklahoma County what we call a Registration Affidavit which is filled out. Certain questions are asked by the Precinct Registrar and it is filled out either by the Registrar or by the person asking to be registered, stating their qualifications, and it is signed by the one asking to be registered, together with the Precinct Registrar."

Witness further explained that based on the Registration Affidavit there would be issued a Registration Certificate by the Precinct Registrar, the original to be given to the person making application to be registered, and the duplicate to be retained by the Precinct Registrar. He stated that there was also kept a Precinct Registration Book, being the registry of voters within a precinct, in accordance with Tit. 26 O.S. 1941 § 77, as amended by Section 2, Senate Bill 178, 22nd Legislature, Laws 1949, p. 214. Witness identified the Registration Affidavit, State's Exhibit 1, signed by the defendant herein, and also the registration certificate, State's Exhibit 2, issued pursuant thereto, and heretofore set out.

Witness on cross-examination denied that it was the practice at precincts to permit persons other than the registrar to register voters, except in cases where the registrar would be ill, and in such cases the Inspector would be authorized to register people on election day.

Ellmore Pinnick testified that he was an attorney by profession, that on March 17, 1953 he served as a precinct official in Precinct 5 of Ward 3 in the capacity of Judge; that he had known the defendant Bob Ingram for 25 years. Witness further testified:

"A. Bob came in. I knew his face but I couldn't place him until he introduced himself. And of course when he mentioned his name I recognized it and him. We had some little conversation about where he was working and about how he was getting along. He said he wanted to change his registration, and I asked him if he had his old registration slip, and he said, 'Yes'; and he gave it to me, and I asked him—I don't know whether I asked him or not—but anyway, he told me that he was building superintendent and he had his headquarters at the City Hall in the Municipal Building, and he wanted to change his registration to that point.

"Q. Did you ask him what his address was? —What his residence address was? A. When I got his registration slip I looked at it. He had reg-

istered on there some other address that I do not recall, and I asked him if that is where he lived. He said that was where he was living at the time, and I asked him something about 200 City Hall. He said that is where he got his mail, and that is where he wanted to change his voting address—200 North Walker, and I told him that under the practice that we had had for years that I didn't see any reason why he couldn't.

"Q. So you registered him at 200 North Walker? A. I gave the registration slip to the lady who was sitting next to me and asked her to fill it out, and I went on with some other business with some other people who were in there. * * *

"Q. Was the registration filled out from information that was given by the defendant? A. It was filled out from the information given by his other registration slip—his previous registration.

"Q. In the question following "residence", where did you get that information? A. We had discussed that as 200 North Walker, and I recall checking this affidavit—registration slip, I found she had '2'. I called her attention to the '2'. I told her it was '200' instead of '2'. She said she would make the change, and she went ahead and I never paid any further attention.

"Q. What you are trying to tell this court and jury is that there was a clerical error in showing the residence address of Bob Ingram as '2 North Walker'? A. That's right. '200', that is the information he gave us. That's the information that was given to the lady that made out the slip."

Witness further testified that a registration certificate was prepared from the registration affidavit and he identified the State's Exhibits 1 and 2 as being the affidavit signed by the defendant and the certificate issued him as based thereon.

On cross-examination witness admitted that the registration information was given to him and not to the registrar, Mrs. Gorman, that the defendant never represented to him that he actually lived at the City Hall, but did tell him that he actually lived at the address shown in his old registration certificate that he turned in on re-registering. He said that defendant told him that he wanted to use the City Hall, his place of business, as his voting address, and witness thought that would be all right. Witness further testified on cross-examination:

"Q. Did Mrs. Gorman, at the time of this registration, sign that certificate, or had she previously signed it? A. Well, I don't know. Now, sometimes we have some that she has previously signed. Sometimes we would get ahead of her and they would be made out, and she would go ahead and sign them up to catch up, and for this particular one, I do not remember. I don't remember whether it was signed or whether it was signed after, or just how it was filled out, I don't remember.

"Q. Now, on State's Exhibit No. 1 for identification, does the registration affidavit show the signature of Bob Ingram filled in, in the presence of Mrs. Gorman Registrar? A. She was in the lobby.

"Q. Was she physically present within three or four feet of Mr. Ingram at the time he signed the certificate? A. I will say that she was within ten feet. The lobby is fairly good-sized.

"Q. Did he swear or did he make any affirmation before her when he signed the affidavit. A. No."

Mrs. W. F. Gorman testified that she was registrar for Precinct 5, Ward 3, and identified State's Exhibit 1 as being her signature and identified State's Exhibit 2. She stated that she did not fill in the blanks in such exhibits or talk with the defendant, or actually swear him.

Jim Jackson, Reporter for the Oklahoma City Times, testified that he had a conversation with the defendant on April 27, or 28. Said he:

"A. I asked Mr. Ingram why he voted in Precinct 5 of Ward 3 when he lived in Ward One, and he said that he voted there because he had heard that a person could vote either at the address

where they lived or at the address where they worked, and he said he considered Ward 3 his home, though he was temporarily living outside of Ward 3, in Ward One, and intended to move back to Ward 3 as soon as he could find a suitable place to live. He said he owned some property in the seven hundred block on, I think, North Ollie, which he had moved from to the address in Ward One.

There was received in evidence a signed statement made by the defendant to the county attorney in which he admitted that State's Exhibit 1, the Registration Affidavit, bore his signature. He claimed that he disclosed to Mr. Pinnick, who, aided by a girl clerk, was at a desk at Precinct 5, Ward 3, registering voters; that he gave Pinnick his old registration certificate, that the girl filled in the affidavit; that he advised Pinnick that he lived at 1717 Northwest 18th Street, but wanted to register at his business address, 200 North Walker; that the references were taken off his old certificate and were of people who lived in Ward of his residence, Ward 1, Precinct 15; that he had heard of an opinion by the Oklahoma Attorney General, dated September 20, 1946 in which it was held that a person might maintain a legal voting residence at a place where he did not actually live, and that he was in good faith in registering where he did.

The State, through O. L. Gibson, Deputy County Assessor, developed that the defendant filed an application for homestead exemption, certifying that on January 1, 1953 he resided at 1717 Northwest 18th Street and was granted homestead exemption for that piece of property. We conclude that the court properly admitted this evidence. While it is true that the fact that one might claim a homestead in one place would not necessarily be conclusive of the fact that such person's voting residence was in the same place, such claim for exemption would be evidence of the location of one's legal residence, and in this case was properly submitted to the jury under proper instructions, as one of the facts and circumstances to be considered in arriving at their verdict.

This closed the evidence for the State, and the court overruled the demurrer interposed. Defendant excepted to the ruling.

Counsel in his opening statement to the jury stated that his defense would be predicated on two things: (1) That no false statement was made by the defendant when he appeared at Precinct 5 of Ward 3 to register, that he told the truth; that he was then living in the northwest part of Oklahoma City, and that he wished to use his place of business, the City Hall, as his voting address; and (2) that defendant honestly believed that he had a right to cast his vote in the precinct where his office was located, and he voted in only one place in that election.

The defendant testified in his own defense, disclaimed any intention to violate the law; claimed that he knew of certain opinions of the Attorney General in which he had held that one could vote at a place other than where he lived, and could claim homestead exemption on a house other than where he voted; and claimed that he had heard of the case of Herman Merson, who was a candidate for election to the Legislature from a ward where he maintained his office, rather than where he actually resided, and introduced an order from the State Election Board upholding his right to file as a candidate from the precinct where his office was located, and two opinions of the Attorney General were also received in evidence.

Defendant testified that he disclosed to Ellmore Pinnick, who aided by a girl clerk was taking care of registrations at Precinct 5, Ward 3, the fact that he actually lived in Ward 1, but wanted to register in Ward 3, Precinct 5, where his office was located, and that Pinnick thought that would be all right; that he delivered to him his old registration certificate and signed the affidavit that was prepared by the officials. He swore that he did not vote in any other precinct in the March 17, 1953 election, or the April 7, 1953 run-off. Witness stated that his interest was in Ward 3, that he owned a home in Ward 3, had previously lived in it, intended to move back to Ward 3 when he could get a place, that he want-

ed to vote for the candidate of his choice and for such reasons made the effort to change his registration.

Herman Merson testified for the defendant, stating that he had practiced law in Oklahoma City since 1930 or 1931; that he ran for State Representative, Second Legislative District of Oklahoma County in 1938; that his qualifications were attacked before the State Election Board; he registered from 132½ West Commerce Street, Precinct 22, Ward 4, rather than at an address on South Hudson, and later on Southwest 25th Street, where he maintained a home. Witness stated, however, that he had always voted at one place. Said he: "From the time I was eleven years old I lived there [132½ Commerce]. I never registered but once in my lifetime, and that was in Precinct 22 of Ward 4." He stated that although he had his office at 132½ Commerce, he also had living quarters there, and owned an interest in the building, but that when he married, although he still maintained sleeping quarters at his office and stayed there part of the time, he did have a residence out of the ward, but never changed his registration or voted elsewhere.

Defendant concluded his defense by producing six character witnesses, all substantial and well known citizens of Oklahoma County, and all of whom testified that they had known the defendant from seven to twenty-five years, and that they were familiar with his reputation in the community for honesty and as a law abiding citizen, and that it was good. This closed the evidence.

Defendant renewed his demurrer, which was overruled. He also requested that the court direct the jury to return a verdict of not guilty, which the court refused to do. Exceptions were saved.

Considering the evidence, it is seen that the defendant made a full disclosure to the election official registering him, as to his actual residence or place of abode, but did tell the official that he wished to change his voting place to the precinct and ward where his office was located. The election official Pinnick stated that he thought this was all right, and proceeded to re-register him. This evidence was produced by the State.

The defendant in offering his witnesses in defense proposed to show by Ellmore Pinnick that it was the common practice for voters to register using their place of business for an address. This was proposed as bearing on the intent of defendant. This evidence was not admitted.

The court did admit the testimony of Herman Merson, as we have seen, showing that Merson had been a candidate for the Legislative district in Oklahoma City in which Merson's office was located, and that the State Election Board had refused to remove Merson's name from the ballot. And there was evidence before the jury that various individuals may have voted in the precinct of their business address, and not in the district of their home address.

■ We conclude that it was not error on the part of the court in excluding evidence of the general practice of permitting electors to vote in the precinct where their office was located, rather than from the precinct where they actually maintained a residence. It is important to keep in mind that the act forming the basis for the charge, and denounced by Section 200 of Title 21 O.S.1951, heretofore quoted, is a case where the elector "knowingly makes any false statement or employs any false representation or false pretense or token, to procure his name to be registered, or his vote to be received, * * *." Here the statute is plain, free from ambiguity, and does not admit of another meaning by context. It is apparent that it was the intent of the Legislature that persons executing affidavits as a basis for voting should be required to give truthful information. The Legislative body could see that false information which would admit illegal voting might undermine the very foundation of the democratic system. So the matter of registration was to be a serious matter— not just a formality without meaning to the elector and to the officials. See McCaffrey, Statutory Construction, § 3, Central Book Co., N. Y., 1953.

The statement charged to be false was contained in a registration affidavit admit-

tedly executed by the defendant, and heretofore quoted. The affidavit, as we have seen, unequivocally sets out defendant's address to be 2 North Walker. It is not represented that such address is the office address of the defendant elector, but the residence. It is represented that defendant continuously resided in precinct 5, ward 3, for thirty days next preceding said registration. The evidence shows otherwise.

The signed registration affidavit formed the basis for the issuance to the defendant of the registration certificate which thereby enabled him to vote in the precinct and ward in question, and the basis for the record in the permanent precinct register of voters.

■ It was the duty of the defendant to read the affidavit that he signed, and if it did not reflect the true facts as to his residence he should not have signed it. A written instrument bearing the signature of the party or parties to it supplants all oral negotiations and all conversation between the parties, and is deemed to express the true intention and will of the person or persons making the representations. The defendant having admitted his signature is held accountable for the representations set forth in the instrument. Tit. 21 O.S.1951 § 96. Although the evidence shows that someone other than the defendant actually filled in the answers in the form of affidavit furnished, yet defendant allowed the statement to pass uncontradicted in the record. Tit. 21 O.S.1951 § 201. We must conclude, therefore, that he, in the words of the statute, "knowingly" signed the registration affidavit aware that it set out his residence at his office address, and at a place different from his true and actual place of abode.

The question of the actual and legal residence of the accused was of vital importance, as one required to entitle accused to vote in Ward 3, Precinct 5, was that he must have "resided" in such ward for a period of thirty days next preceding the election as provided by Tit. 26 O.S.1951 § 61. Webster's New International Dictionary defines the term "reside" to mean "to be in residence, one's place of abode". And Black's Law Dictionary, 3d Ed. defines

"residence" as "living or dwelling in a certain place permanent or for a considerable length of time. The place where a man makes his home, or where he dwells permanently or for an extended period of time. One's house, or dwelling".

■ We conclude, therefore, that the word "reside" as used in Tit. 26 O.S.1951 § 61, specifying the qualifications of electors to be entitled to vote in Oklahoma, means to be in residence, one's place of abode, as distinguished from a place where one is employed or an office or place devoted strictly to commercial enterprise.

■ It is true here that the actual registrar had apparently delegated her duties to another precinct election official, and had so far forgotten the solemnity of an oath and her duties as the official designated by the statute, Tit. 26 O.S.1951 §§ 76, 77, 78, to take acknowledgments of electors, as to attach no importance whatever to the procedure prescribed for the purpose of bringing to the consciousness of the one taking the oath the importance of deliberation and of thoroughly realizing the import of his signature and that of the person administering the oath to the statements subscribed to. The registrar here even signed blanks that would eventually approve and represent as regular purported affidavits of persons she actually could not know ever affixed their signature or whether they, too, signed in blank without knowledge of the information later written in the blanks. Such apathy and carelessness and negligence strikes at the very foundation of the democratic process, encouraging laxness and unlawfulness on the part of the elector, and demonstrates the importance of schools of instruction by members of county election boards for all precinct officials to make sure that they understand their duties and possess the ability and courage to carry out the responsibilities assumed. If the registrar of Precinct 5, Ward 3 had taken seriously her obligations, had been familiar with her duties and had assumed to carry out such duties, she would have discovered that the defendant could not claim his office address as his residence when he did not in fact maintain his residence at his office, and would have never issued to him a registra-

tion certificate entitling him to vote in such precinct.

But the carelessness and laxness and negligence of precinct election officials can not excuse a person who subscribed to a false statement. And here nowhere in the evidence is it contended that defendant ever maintained his residence at 2 North Walker, or 200 North Walker, so that the statement subscribed to must in face of such fact be deemed false.

We are faced with the truth that defendant's efforts to change his voting place from that of his family was not just a casual matter. He worked at the Municipal Building, the election was a municipal election, and it appears that defendant's motive and interest was in the candidate from Ward 3, rather than in the ward where he actually lived. At all events he was not interested in a candidate from the ward of his residence, and hence his efforts to change his voting place. There had apparently been propaganda from some source that such a change would be legal, as a number of persons had adopted such idea.

The instructions given the jury were very favorable to the defendant, but the jury faced with compelling evidence found the defendant guilty as charged. The jury was unable to agree upon the punishment, and the same was fixed by the court as stated.

By reason of the facts peculiar to this case and in the interest of fairness and uniformity, it is required that we give consideration to the matter of the punishment assessed.

The record discloses that prior to the assessment of the penalty by the court that counsel for the defendant called attention to the fact, as he stated, that the assistant county attorney in his closing argument to the jury suggested to the jury that they fix the punishment at $1, and one day imprisonment, and counsel called attention to the previous good record of the defendant, as developed by the testimony of his character witnesses.

In a companion case herewith, Leasure v. State, Okl.Cr., 275 P.2d 344, in another division of the court of common pleas, on an identical charge where a plea of guilty was entered, the punishment was fixed at ten days imprisonment and a fine of $250, while the record showed that several other defendants with similar charges as here, and arising out of voting in Ward 3, Precinct 5, were given suspended sentences.

Of course as to such cases where suspended sentences were given this court has no way of knowing what the circumstances might have been. However, we can not visualize extenuating circumstances that would be more appealing than that the accused did undisputedly give full information to the election official as to his actual residence previous to registering, together with the basis for his thought that he would be entitled to register from the precinct where his office was located. Also that the election official did not take issue, did not seek the advice of the county attorney, city attorney or higher election officials, but agreed that defendant might reregister from his office address while at the same time causing the registration affidavit to be prepared so as to show the address given as actually a residential address, which thereby caused it to comply with Tit. 26 O.S.1951 § 61.

And while the Attorney General's opinions defendant claimed to have heard of do not support the proposition that one may be entitled to claim an office address, which is not a place of residence or abode, as a "residential" address and be entitled to register in the precinct where such office is located, rather than in the precinct where he actually has a home, from the opinions introduced it it apparent that defendant could have been in good faith, although he assuredly needed legal advice in the interpretation of such opinions and in the application of the principles developed in the opinions in question. The same can be said as to the Merson case, heretofore mentioned, where the facts were far different from those in the present case. There Merson actually had a bedroom in connection with his office; it had been his home from early youth and he had never changed such legal residence, though after marriage he had maintained homes in other wards, but not with intent to change his legal residence, which had never been abandoned.

The purpose of the assessment of punishment for law violation by modern view in democracies is not punishment for punishment's sake, but as a deterrent. See Lecture II, The Common Law, Oliver W. Holmes, Jr., Little-Browne & Co., Boston.

It is only by reason of the incompetence, apathy and laxness of the registration officials that the registration in question was made possible. There had never been a test case involving the statute in question. It would seem that in the interest of fairness, consideration should be given to the action of the courts in the cases of others convicted for the same offense. The defendant's previous record for good citizenship must not be overlooked. We conclude that the record compels a modification of the punishment assessed, and that punishment of a fine of $150 would be more in keeping with and responsive to the evidence, and demonstrate the striving for fairness and uniformity in the assessment of punishment for crime.

The judgment and sentence of 90 days imprisonment in the county jail, and a fine of $300 is modified to a fine of $150, with the jail sentence remitted, and as so modified, is affirmed.

JONES and BRETT, JJ., concur.